Digital Recorders, Inc. v. McFarland, 2007 NCBC 23

STATE OF NORTH CAROLINA

GASTON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
07 CVS 2247

DIGITAL RECORDERS, INC.,

    Plaintiff,

      v.

WILLIAM MCFARLAND, and INIT
INNOVATIONS IN
TRANSPORTATION, INC.,

    Defendants.

ORDER & OPINION

*Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, P.A. by Michael Carpenter and William E. Moore, Jr. for Plaintiff Digital Recorders, Inc..*

*Glenn, Mills & Fisher, P.A. by Stewart W. Fisher for Defendant William McFarland and Vandeventer Black, LLP by Norman W. Shearin, Jr. for Defendant INIT Innovations in Transportation, Inc.*

Diaz, Judge.

{1}    Before the Court are the following Motions of Plaintiff Digital Recorders, Inc., ("DRI"): (1) Motion for Preliminary Injunction, and (2) Motion to Supplement, for Rehearing, and for Reconsideration.

{2}    After considering the Court file, the Verified Complaint, the written Motions, the briefs and materials filed in support and in opposition, the affidavits submitted by the parties, and the arguments of counsel, the Court **DENIES** the Motion for Preliminary Injunction, **GRANTS** the Motion to Supplement, **DENIES** the Motion for Rehearing, and **DENIES** the Motion for Reconsideration.

# I.

## PROCEDURAL BACKGROUND

{3} DRI filed its Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on 17 May 2007.

{4} The Verified Complaint alleges claims for misappropriation of trade secrets, tortious interference with contract, breach of contract, conversion, and unfair and deceptive trade practices arising out of two employment agreements signed by DRI and Defendant William McFarland ("McFarland"). (Compl. ¶¶ 21–49.) DRI seeks compensatory, statutory, and punitive damages, as well as injunctive relief. (Compl. ¶¶ 50–59, Prayer for Relief.)

{5} On 17 May 2007, Senior Resident Superior Court Judge Jesse B. Caldwell, III, entered a temporary restraining order ("TRO") in this case.

{6} The TRO prohibited McFarland from: (1) soliciting or contacting DRI's present or future customers in Nebraska, Florida, or any other state where McFarland had a customer relationship while employed by DRI, or (2) using, converting, or disclosing DRI's confidential information or trade secrets. (TRO 3, May 17, 2007.)

{7} The TRO prohibited Defendant INIT Innovations in Transportation, Inc. ("INIT") from making any use of confidential information or trade secrets acquired from McFarland, and it prohibited both Defendants from: (1) unlawfully interfering with the contractual and business relationships between DRI and its present or potential customers and suppliers, or (2) destroying, mutilating, or transferring any documents in their possession that contain any confidential information or trade secrets belonging to DRI or any information relating to the facts in this case. (TRO 3.)

{8} Judge Caldwell set the matter on for further hearing on 29 May 2007 as to DRI's Motion for Preliminary Injunction. (TRO 4.)

{9} The matter was transferred to the North Carolina Business Court and assigned to me as a complex business case on 21 May 2007.

{10}   McFarland filed a brief in opposition to the Motion for Preliminary Injunction on 29 May 2007.  That same day, the Court heard oral arguments on the Motion.[1]

{11}   On 30 May 2007, the Court notified the parties via e-mail that it would **DENY** the Motion for Preliminary Injunction and enter a written order.

{12}   On 8 June 2007, DRI filed a Motion to Supplement, for Rehearing, and for Reconsideration, and also filed two additional affidavits from David Turney and Michael Gilles, DRI's Chairman/CEO and Human Resources Director, respectively.

{13}   On 14 June 2007, McFarland filed a response to this motion, and on 25 June 2007, DRI filed a reply in support of it.

{14}   Pursuant to Business Court Rule 15.4, the Court enters this Order without further hearing on the Motions.


II.

A.

THE PARTIES

{15}   DRI is a North Carolina corporation with its principal office located in Dallas, Texas.  (Compl. ¶ 1.)  DRI develops and manufactures electronic devices for use in mass transit applications and in other transportation related fields.  (Compl. ¶ 4.)  It conducts approximately fifty percent of its business and sales across the United States.  (Taylor Supplemental Aff. ¶ 3, May 24, 2007.)

{16}   McFarland resides in Durham County, North Carolina.  (Compl. ¶ 2.)

{17}   INIT is a multinational corporation with a principal place of business located in Chesapeake, Virginia.  (Compl. ¶ 3.)  INIT also develops and manufactures electronic devices for use in mass transit applications and in other transportation related fields.  (Compl. ¶¶ 11, 14; Def. McFarland's Br. Opp'n Pl.'s Mot. Prelim. Inj. 6.)  For purposes of this Motion, the Court assumes that INIT is DRI's direct competitor.

---

[1] By consent of the parties, the hearing on the Motion for Preliminary Injunction took place in Mecklenburg County.

B.

## FINDINGS OF FACT

{18} On or about 24 March 1999, DRI offered McFarland employment as the company's Director of Software Engineering. (Compl. ¶ 5; McFarland Aff. ¶ 4, May 25, 2007.)

{19} On 6 April 1999, McFarland accepted DRI's offer of employment. (McFarland Aff. ¶ 4, May 25, 2007.)

{20} McFarland began work on 16 May 1999. (McFarland Aff. ¶ 7, May 25, 2007.) That same day, McFarland and DRI signed a "Pre-Employment Agreement" that contained the following covenant:

> Employee agrees that during his/her employment with Digital Recorders, and for a period of one year after the termination of Employee's employment, irrespective of the time, manner or cause of termination (**unless termination is without cause**), Employee will not, without the prior written consent of Digital Recorders, directly or indirectly enter into, work for or engage (as owner, employee or otherwise) in any business, work, services, or activities which are in competition with or are competitive with Digital Recorders, or perform any services or tasks similar to the services and tasks he/she performed for Digital Recorders while employed by Digital Recorders, either as an individual for his/her own account or as a partner, joint venturer, consultant, employee, agent, officer or director for any other person, firm, partnership, corporation or other entity in competition with Digital Recorders.

(Compl. Ex. B § 6 (emphasis added).)

{21} Pursuant to this agreement, McFarland also committed to keep and maintain the confidentiality of any proprietary information gleaned during his employment. (Compl. Ex. B § 5.)

{22} The Pre-Employment Agreement does not define what constitutes termination without cause.

{23} On or about 18 June 1999, McFarland signed a second covenant not to compete. (Compl. ¶ 7.) By this time, McFarland had been working for DRI for approximately one month.

{24}   As consideration for this agreement, DRI provided McFarland with an option for one thousand shares of the Company's stock. (McFarland Aff. ¶ 9, May 25, 2007.)[2]

{25}   The second covenant provides in relevant part:

> That at anytime while engaged as an Employee of DRI and for a period o [sic] one (1) year following his termination of employment for any reason, he will not directly or indirectly, with or through any family member or former director, officer or employee of DRI, or acting alone as a member of a partnership or as an officer, holder of or investor in as much as 5% of any security of any class, director, employee, consultant or representative of any corporation or other business entity,
>
> > (1) engage within the United States of America in the digital recorder/player industry or low power broadcast business; or
> >
> > (2) request any present or future customers or suppliers of DRI to curtail or cancel their business with DRI or any other company owned or operated by DRI.

(Compl. Ex. C § 7(a)(i).)

{26}   In February 2006, DRI hired The Castleton Group, Inc. ("Castleton"), to provide payroll management, tax compliance, employee benefits, workers' compensation, and unemployment administration, as well as other administrative functions relating to DRI's work force. (Turney Aff. ¶ 7, Ex. 1.). According to DRI's evidence, Castleton and DRI "technically became co-employers of McFarland." (Turney Aff. ¶ 7.)

{27}   McFarland alleges, however, that, beginning in 2006, Castleton was his sole employer, following DRI's decision to terminate its employees and lease them back from Castleton as independent contractors. (McFarland Aff. ¶¶ 17–18, May 25, 2007.)

---

[2] McFarland argues that this consideration was illusory because the stock options were not properly registered with regulatory authorities and, therefore, essentially worthless. (Def. McFarland's Br. Opp'n Pl.'s Mot. Prelim. Inj. 5.) The Court does not reach this argument, however, as there are other grounds for denying the Motion.

{28} Consistent with his view of the employment relationship, McFarland's 2006 W–2 Wage and Tax Statement lists only Castleton as McFarland's employer. (McFarland Aff. Ex. F, May 25, 2007.)

{29} On or about 16 March 2007, DRI placed McFarland in "temporary lay-off" status. (Compl. ¶ 10.)

{30} Although he was originally employed as an engineer, McFarland was employed as DRI's Director of Marketing at the time he was laid off. (McFarland Aff. ¶ 4, May 25, 2007.)

{31} On or about 30 April 2007, McFarland resigned his employment with DRI and took a job with INIT. (McFarland Aff. ¶¶ 33–34, May 25, 2007.)

{32} DRI's Complaint alleges that McFarland's new employment violates the terms of the first and second covenants. (Compl. ¶¶ 13–15.) DRI also alleges, upon information and belief, that McFarland "has and currently continues to solicit the current and future customers and suppliers of Plaintiff" and "has or may disclose . . . confidential information to INIT and others in derogation of the [covenants]." (Compl. ¶¶ 15, 17.)

{33} DRI's evidence on these points consists of: (1) the affidavit of one employee who claims to have seen McFarland at a sales convention where McFarland told her of two current customers of DRI that McFarland had maintained contact with in Nebraska and Florida (Graman Aff. ¶ 5), and (2) the affidavit of another employee who "received reliable information from a temporarily laid off employee of DRI" that McFarland had asked the laid off employee to conspire with him to sabotage a DRI order pending in Nebraska (Albert Aff. ¶¶ 4–5).

{34} Both covenants state that they shall be governed by North Carolina law. (Compl. Ex. B, C.)

## III.

## CONCLUSIONS OF LAW

### A.

### PRELIMINARY INJUNCTION STANDARD

{35} A preliminary injunction is an extraordinary measure that will issue only upon a showing that: (1) there is a likelihood of success on the merits of the movant's case, and (2) the movant will likely suffer irreparable loss unless the injunction is issued. *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977).

{36} DRI has failed to make a showing sufficient to satisfy either prong of this test.

### B.

### LAW ON COVENANTS NOT TO COMPETE

{37} Under North Carolina law, a covenant not to compete is valid and enforceable if it is: (1) in writing, (2) made a part of the employment contract, (3) based on valuable consideration, (4) reasonable as to time and territory, and (5) designed to protect a legitimate business interest of the employer. *Okuma Am. Corp. v. Bowers*, 638 S.E.2d 617, 620 (N.C. Ct. App. 2007) (citing *Farr Assocs., Inc., v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000)).

{38} "Covenants not to compete between an employer and employee are 'not viewed favorably in modern law.'" *Baskin*, 138 N.C. App. at 279, 530 S.E.2d at 881 (quoting *Hartman v. W. H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994)).

{39} To be valid, the restrictions on the employee's future employability by others "must be no wider in scope than is necessary to protect the business of the employer." *Manpower of Guilford County, Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979) (citations omitted).

{40} If a covenant not to compete "is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a

contract if it is too broad but will simply not enforce it." *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989) (citations omitted).

{41} Restrictions barring an employee from working in an identical position for a direct competitor are valid and enforceable. *See Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 638–39, 568 S.E.2d 267, 273 (2002) (finding a one-year, two-state restriction against employment in the same area with a direct competitor to be reasonable and within a legitimate business interest).

{42} On the other hand, courts will not enforce a covenant that, rather than attempting to prevent a former employee from competing for business, instead requires the employee "to have no association whatsoever with any business that provides [similar] services." *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920.

## C.

## ANALYSIS

{43} DRI seeks to enjoin McFarland from continuing his employment with INIT, which DRI alleges to be in violation of two separate covenants not to compete. (Compl. ¶¶ 13–15.)

{44} DRI's Complaint also seeks to enjoin McFarland from (1) soliciting its clients and suppliers, and (2) disclosing confidential information to INIT, in violation of the covenants. (Compl. ¶¶ 15, 17.)

{45} By its terms, however, the first covenant (contained in the Pre-Employment Agreement) does not apply where an employee is terminated without cause. (Compl. Ex. B § 6.)

{46} The Pre-Employment Agreement does not discuss what constitutes termination without cause. Accordingly, the Court resorts to the plain meaning of the term.

{47} The evidence of record shows that McFarland was temporarily laid off before resigning to take a job with INIT. (Compl. ¶ 10.) DRI has presented no evidence that McFarland was terminated with cause. As a result, DRI has not

shown a likelihood of success on the merits of its claim with respect to the first covenant not to compete.[3]

{48} The second covenant extends for one year immediately following the termination of employment and prohibits McFarland from

> directly or indirectly, with or through any family member or former director, officer, or employee of DRI, or acting alone or as a member of a partnership or as an officer, holder of or investor in as much as 5% of any security of any class, director, employee, consultant or representative of any corporation or other business entity,
>
> > (1) engag[ing] within the United States of America in the digital recorder/player industry or low power broadcast business; or
> >
> > (2) request[ing] any present or future customer or suppliers of DRI to curtail or cancel their business with DRI or any other company owned or operated by DRI.

(Compl. Ex. C § 7(a)(i).)

{49} DRI has not met its burden to demonstrate a likelihood of success on the merits of its claim with respect to this covenant.

{50} First, there is some question as to whether the second covenant expired by its terms before McFarland is alleged to have violated it. On its face, the second covenant binds only DRI and McFarland, and then only for one year following McFarland's termination of employment. (Compl. Ex. C § 7(a)(i).)

{51} McFarland's evidence tends to show that on or about 15 February 2006, DRI may have transferred its employees, including McFarland, to Castleton, which then leased them back to DRI, with Castleton maintaining control of the payment of salaries and taxes for these employees. (McFarland Aff. ¶¶ 17–18, May 25, 2007.) Indeed, McFarland's 2006 W–2 form unequivocally states that McFarland was employed by Castleton, and McFarland's evidence is that he remained so employed

---

[3] In any event, the first covenant fails as a matter of law because it contains no ascertainable limit as to its geographic scope. *See Prof'l Liab. Consultants, Inc. v. Todd*, 122 N.C. App. 212, 219, 468 S.E.2d 578, 582 (1996) (Smith, J., dissenting), *rev'd per curiam*, 345 N.C. 176, 478 S.E.2d 201 (1996) (adopting Judge Smith's dissent that non-compete covenant was unenforceable because it contained no particularized geographic restriction).

until he was laid off on or about 16 March 2007. (McFarland Aff. Ex. F, May 25, 2007.)

{52}   This evidence supports McFarland's claim that he ceased to be DRI's employee on 15 February 2006 and that the termination of his employment triggered the running of the one-year restriction. DRI's Complaint alleges that McFarland began employment with INIT in late March to early April 2007. (Compl. ¶ 11.) Thus, McFarland's evidence tends to show that the covenant was not in force on the date of the alleged breach.

{53}   DRI, however, disputes McFarland's allegations and has presented two post-hearing affidavits from its Chairman/CEO and Human Resources Director tending to show that (1) Digital Recorders retained Castleton to provide payroll management, tax compliance, employee benefits, workers' compensation, and unemployment administration, as well as other administrative functions relating to DRI's work force, (2) as a result, DRI and Castleton became McFarland's co-employers, and (3) McFarland understood that this was so. (*See* Mot. Supplement, Rehearing, Reconsideration.)

{54}   DRI argues that this co-employment relationship is entirely consistent with North Carolina law, which sanctions and regulates so-called Professional Employment Organization ("PEO") agreements by which a company may outsource some or all of its human resource functions to a separate entity. *See* North Carolina Professional Employer Organization Act, N.C. Gen. Stat. §§ 58–89A–1 to –180 (LEXIS through 2007 legislation) (establishing licensing and operating standards for PEOs and defining a PEO agreement as a written contract between a client company and a PEO that establishes a regime of shared responsibilities for "assigned employees").

{55}   The Court **GRANTS** DRI's Motion to Supplement the record. However, the Court also declines to resolve the dispute as to McFarland's employment status, as there are other grounds to deny the Motion for Preliminary Injunction.

{56} More specifically, DRI's Motion for Preliminary Injunction fails because the second covenant contains overly broad and unreasonable restrictions on competition.

{57} Even assuming that the one-year time period in the second covenant is otherwise reasonable and that the territory defined by the covenant protects DRI's legitimate business interests (and there is some doubt about this latter contention given the evidence of record),[4] under this agreement, McFarland would not merely be prevented from engaging in work similar to that which he did for DRI, but would also be prevented from doing even wholly unrelated work at any firm that competes with DRI or offers the same or similar products and services.

{58} Thus, the language of the second covenant would effectively prevent McFarland from working as a security guard or custodian (or even, as DRI's counsel conceded at oral argument, an engineer) for any company within the United States engaged in DRI's business. Such vast restrictions cannot be enforced, *see, e.g.*, *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 509, 606 S.E.2d 359, 363 (2004), nor may the Court rewrite the employment agreement to fit the facts of the case. *See Hartman*, 117 N.C. App. at 317–18, 450 S.E.2d at 920 (refusing to apply the "blue-pencil rule" to non-compete covenant that was "overly broad in that, rather than attempting to prevent plaintiff from competing for . . . business, it requires plaintiff to have no association whatsoever with any business that provides [similar] services").

{59} Moreover, by preventing McFarland from even "indirectly" owning five percent or more of any security of any class of a business that competes with DRI, McFarland would be prohibited from holding an interest in a mutual fund invested

---

[4] Judge Caldwell recognized as much when he entered a TRO narrowing the geographic scope of the second covenant to those states where DRI actually had customers or where McFarland had developed customer relationships while employed by DRI. (TRO 2–3.) But, the language of the second covenant is much broader, in that it purports to prohibit McFarland from engaging in a competitive business anywhere "within the United States of America." (Compl. Ex. C § 7(a)(i).) Moreover, despite Judge Caldwell's well-intentioned effort, North Carolina law does not allow a court to "blue-pencil" an overly broad covenant to fit the facts. *Hartman*, 117 N.C. App. at 318, 450 S.E.2d at 920.

in part in a firm engaged in business similar to that of DRI. Such a provision also is unenforceable. *See VisionAIR*, 167 N.C. App. at 509, 606 S.E.2d at 363.

{60} The covenant also improperly attempts to prevent McFarland from competing with respect to DRI's future customers, which the Court concludes does not protect any legitimate interest of an employer. *See Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1148 (Ill. App. 1999) ("As a matter of law, [an employer] cannot have a protectible [sic] interest in future customers who do not yet exist.")

{61} Recognizing the problem with the second covenant's broad language, DRI proposes that the Court "blue-pencil" the covenant in the following manner:

> That at any time while engaged as an employee of DRI and for a period of one (1) year following his termination of employment for any reason, he will not directly ~~or indirectly, with or through any family member or former director, officer, or employee of DRI, or acting alone or as a member of a partnership or as an officer, holder of or investor in as much as 5% of any security of any class, director, employee, consultant or representative of any corporation or other business entity,~~
>
> > (1) engage within the United States of America in the digital recorder/player industry or low power broadcast business; or
> >
> > (2) request any present or future customers or suppliers of DRI to curtail or cancel their business with DRI or any other company owned or operated by DRI.

(Br. Supp. Pl.'s Mot. Supplement, Reconsideration, Rehearing 9.)

{62} It bears repeating, however, that:

> When the language of a covenant not to compete is overly broad, North Carolina's "blue pencil" rule severely limits what the court may do to alter the covenant. A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant.

*Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920.

{63} The cases cited in DRI's reply brief do not support its "blue-penciling" proposal.

{64}  To begin with, federal and foreign state cases applying the "blue-pencil" doctrine in other jurisdictions do little to inform the Court as to its obligations under North Carolina law.

{65}  Moreover, the two North Carolina cases relied on by DRI are easily distinguishable.

{66}  In *Seaboard Indus., Inc. v. Blair*, 10 N.C. App. 323, 178 S.E.2d 781 (1971), the Court of Appeals construed a covenant governed by Georgia law.  For that reason, the court's analysis, while somewhat helpful, does not resolve the precise issue before me.

{67}  In *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 379 S.E.2d 824 (1989), our Supreme Court affirmed a jury verdict for damages arising from the defendant's breach of a non-solicitation covenant.  The defendant there argued that the entire covenant was unenforceable because it contained language effectively prohibiting defendant from employment in any capacity with plaintiff's manufacturing competitors.  The *Whittaker* court rejected this argument, noting that "plaintiff has not attempted to enforce the provision of the contract which forbids [defendant] from engaging in manufacturing."  *Id.* at 528, 379 S.E.2d at 828.

{68}  In contrast, DRI's "blue-pencil" proposal does not alter the fact that DRI seeks to enforce the second covenant's restrictions on employment, as well as its non-solicitation and confidentiality provisions.

{69}  Regardless, DRI's suggested edits do not cure the impermissibly broad language of the second covenant, as it remains unclear what employment McFarland may undertake in the digital recorder/player industry or low power broadcast business without running afoul of the covenant's restrictions.

{70}  I also note the dearth of evidence in this record that McFarland or INIT have used any confidential information or trade secrets belonging to DRI or that they have attempted to destroy evidence relevant to this lawsuit.  Further, DRI's evidence that McFarland has solicited its customers is pitifully vague and, in at least one instance, based on hearsay.

{71}  For these reasons, I find that DRI has not shown that it is likely to suffer irreparable harm if the covenant is not enforced.

{72}  In sum, DRI has not met its burden to show either a likelihood of success on the merits of its claim or irreparable harm.  I also find no reasonable way by which the Court could attempt to enforce the second covenant without re-writing it.

{73}  There is one final point.  At the hearing of this matter, DRI's counsel suggested that a finding against enforceability of the covenants would be inconsistent with this Court's purpose as a Business Court.  Counsel misapprehends badly this Court's charter.

{74}  The North Carolina Business Court was created to provide judicial specialization in complex business litigation.  This Court's judges do not, however, decide cases based on the prevailing economic winds, nor do we consider how best to promote a litigant's business interests.  Our oath is the same as that of any judge of this state—to apply the law and decide cases without regard to the parties who are before us.

{75}  Here, that oath binds me to deny DRI's Motion for Preliminary Injunction, as DRI has not shown that the covenants at issue are enforceable.

IV.

CONCLUSION

{76}  For the reasons set forth above, the Court **DENIES** DRI's Motion for Preliminary Injunction, **GRANTS** DRI's Motion to Supplement, **DENIES** DRI's Motion for Rehearing, and **DENIES** DRI's Motion for Reconsideration.

This the 29th day of June, 2007.