Akzo Nobel Coatings Inc. v. Rogers, 2011 NCBC 41.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 3013

AKZO NOBEL COATINGS INC.,

Plaintiff,

v.

DAVID B. ROGERS, BUDDY KEITH TAYLOR, ROBERT A. PARKER, JOSEPH E. CARAVELLO, MARTIN R. SCHONING, ATEC COATINGS, LLC, and ATEC WIND ENERGY PRODUCTS, LLC,

Defendants.

ORDER ON MOTION FOR
JUDGMENT ON THE PLEADINGS

{1} THIS MATTER is before the Court on the Motion for Judgment on the Pleadings ("Motion") on Behalf of David B. Rogers ("Rogers"), Buddy Keith Taylor ("Taylor"), Robert A. Parker ("Parker"), Joseph E. Caravello ("Caravello"), and Martin R. Schoning ("Schoning") (collectively, "Individual Defendants"), pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure ("Rule(s)").

> *Nelson Mullins Riley & Scarborough, L.L.P. by Mark A. Stafford, Donald R. Pocock, and Brian R. Anderson for Plaintiff.*

> *Womble Carlyle Sandridge & Rice, PLLC by Ronald R. Davis and Brent F. Powell for Defendants David B. Rogers, Buddy Keith Taylor, Robert A. Parker, Joseph E. Caravello, and Martin R. Schoning.*

Gale, Judge.

## I. INTRODUCTION

{2} Plaintiff filed this action seeking injunctive and monetary relief against the Individual Defendants and two corporate defendants. The

Individual Defendants are former employees of a company acquired by Plaintiff, some of whom continued employment with Plaintiff. Plaintiff alleges they have misused confidential information and misappropriated trade secrets in violation of various non-compete and non-solicitation agreements. The Motion attacks all of Plaintiff's claims except one trade secrets claim against Defendant Parker. The Motion asserts, *inter alia*, that each claim depends on non-competition and non-solicitation covenants which are overly broad and unenforceable as a matter of law. The Motion further asserts that the tort claims and the unfair and deceptive practices claim must fail because Plaintiff should be confined to its contract remedies.

{3} The Motion is GRANTED IN PART and DENIED IN PART. Disputed material facts remain on at least some of the contract claims. Plaintiff should not be allowed to pursue tort claims based on the contracts at issue. The unfair and deceptive practice claims against defendants other than Parker should be dismissed.

## II. PROCEDURAL HISTORY

{4} Plaintiff filed this action in Guilford County on January 24, 2011. The matter was designated a Complex Business Case and assigned to this Court on January 27, 2011. Plaintiff asserts seven claims: 1) breach of contract based on non-compete, non-solicitation, and confidentiality agreements; 2) fraud, or alternatively, negligent misrepresentation (against only Defendant Rogers); 3) unfair and deceptive trade practices under N.C. Gen. Stat. §§ 75-1.1 *et seq.* ("Chapter 75"); 4) tortious interference with contract; 5) tortious interference with prospective economic advantage; 6) misappropriation of trade secrets; and 7) punitive damages. The Complaint incorporates each of the Individual Defendant's employment agreements.

{5} All Defendants answered the Complaint on March 30, 2011. The Individual Defendants filed the Motion on May 26, 2011.

{6} The Motion has been fully briefed, the Court heard oral argument, and the Motion is ripe for disposition.

### III. STATEMENT OF FACTS

{7} The following facts are taken from the Complaint and accepted as true for purposes of the Motion with reasonable inferences drawn in Plaintiff's favor without giving effect to conclusions of law unsupported by factual allegations or inferences drawn from those facts. *Branch Banking & Trust Co. v. Lighthouse Fin. Corp.*, 2005 NCBC 3 ¶ 8 (N.C. Super. Ct. July 13, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%203.htm.

### A. The Parties

{8} Plaintiff Akzo Nobel Coatings, Inc. ("Plaintiff" or "Akzo Nobel") is a company existing under the laws of the State of Delaware doing business in North Carolina. Plaintiff conducts business throughout the United States and its affiliated companies sell industrial coatings and specialty chemicals internationally.

{9} Defendants ATec Coatings, LLC ("ATec Coatings") and ATec Wind Energy Products, LLC ("ATec Wind") (together, "ATec") are North Carolina limited liability companies. The Individual Defendants are former employees of Chemcraft Holdings Corporation ("Chemcraft") or one of its subsidiaries. Defendant Rogers was a Chemcraft officer and shareholder. Chemcraft and its subsidiaries merged into Akzo Nobel via a stock purchase.[1] With the exception of Rogers, each Individual Defendant continued to work for Akzo Nobel after the merger.

---

[1] Plaintiff alleges that Chemcraft: 1) owned a number of subsidiaries or related companies, including Chemcraft International, Inc.; Chemcraft Coatings, Technologies, LLC; Chemcraft Systems, LLC; Chemcraft Coatings, Inc.; and Chemcraft International Holdings, LLC (collectively, the "Chemcraft Related Companies"); 2) through its subsidiaries or related companies, was North America's largest privately-owned manufacturer of industrial wood coatings prior to the merger; and 3) conducted substantial domestic and international business in the industrial wood coatings and other lines of businesses. Akzo Nobel's acquisition of Chemcraft Holdings closed on July 24, 2007. Chemcraft Holdings merged into Akzo Nobel on December 31, 2007.

{10} Rogers, a North Carolina resident, executed a "Consulting Agreement" with Akzo Nobel in May 2007 in connection with the sale of his Chemcraft stock, whereby he agreed to consult and advise Akzo Nobel on the "industrial wood coatings business of Chemcraft, and certain other services related thereto . . . ." (Consulting Agreement ("Rogers Agreement") ¶ 1) in exchange for $9,500,000.00 and other consideration. (Compl. ¶ 20; Answer of Def. David B. Rogers ¶ 20.)

{11} Defendant Taylor, a Texas resident, was the former "national marketing manager for Chemcraft International specializing in European high solids wood finishes . . . ." (Compl. ¶ 57.) He became Director of Sales and Marketing for Akzo Nobel. Prior to May 2009, he had sales and management responsibilities across all Akzo Nobel markets in the United States. (Compl. ¶ 51.) He received $304,000.00 from Akzo Nobel as consideration for an employment agreement dated May 17, 2007. (Compl. ¶ 52; Answer of Def. Buddy Keith Taylor ¶ 52.) Plaintiff refers to Taylor as a "founder" of ATec currently in charge of its sales and marketing. (Compl. ¶ 56.)

{12} Defendant Schoning, a North Carolina resident, was Business Development Manager for Flooring for Akzo Nobel prior to October 2009, based in High Point, North Carolina. Plaintiff asserts he played a substantial role in Akzo Nobel's wood and vinyl flooring business across the United States, and "formulated and modified coatings and obtained, through his employment with Akzo Nobel, substantial expertise in the application of industrial coatings." (Compl. ¶ 69.) He received $50,000.00 to execute a "Non-Competition and Non-Solicitation Agreement" with Chemcraft on October 18, 2007. (Compl. ¶ 71; Answer of Def. Martin R. Schoning ¶ 71.) Schoning resigned his employment with Akzo Nobel in October 2009. Plaintiff refers to him as a "founder" of ATec. (Compl. ¶ 75.)

{13} Defendants Parker, an Arizona resident, and Caravello, a Texas resident, are former Akzo Nobel Sales Service Representatives. Parker

signed a "Confidentiality Agreement and Covenant Not to Compete" with Chemcraft International, Inc. on August 1, 2003. Caravello signed a substantially similar "Confidentiality Agreement and Covenant Not to Compete" with Chemcraft International, Inc. on April 1, 2004. Parker resigned his employment with Akzo Nobel in July 2009. Caravello resigned in January 2010. Plaintiff refers to both men as "founders" of ATec. (Compl. ¶ 66.)

### B. The Consulting and Employment Agreements

1. The Rogers Consulting Agreement

{14} The Rogers Agreement executed with Akzo Nobel contains, *inter alia*, a choice-of-law provision, a non-competition provision, and a non-solicitation provision. It states that the agreement "shall be governed by the laws of the state of Delaware, without giving effect to any choice or conflict of laws provision or rules that would cause the application of laws of any jurisdiction other than the State of Delaware." (Rogers Agreement ¶ 18(a).)

{15} In the section titled "Non-Competition," the Rogers Agreement states that for four (4) years following termination (the "Restricted Period"), Rogers would not

> directly or indirectly (including as a creditor, guarantor, financial backer, stockholder, director, officer, consultant, advisor, employee, member, investor, producer, or otherwise), individually or through any Person that he controls, engage in, participate in, or acquire an equity interest in any Person that engages or participates in any business that competes in any way with any Company Entity engaged in the business of wood coatings ("Restricted Business"), other than in accordance with the provisions of this Section 7.

(Rogers Agreement ¶ 7(a)(i).)[2]

---

[2] Section 7 allows Rogers to have equity ownership interests in competitors provided: (1) the interests are listed or traded on a national securities exchange or on the NASDAQ Stock market and that they constitute less than 4% of the outstanding shares; and (2) he is not actively involved in the management of such business. (Rogers Agreement ¶ 7(a)(ii).)

{16} The Rogers Agreement also states that during the Restricted Period, Rogers would not, without Akzo Nobel's consent,

> directly or indirectly, individually or through any Person that he Controls:
>
> (i) become an employee, consultant, advisor, director, officer, producer, partner or, or [sic] joint or co-venturer with, enter into any contract, agreement, or arrangement with, or seek to influence (x) any Person with respect to a Restricted Business, or (y) any Person that is a joint or co-venturer with, or partner of, any Company Entity, or otherwise engaged in any material on-going business relationship or discussions or negotiations with a view to entering into such a relationship, or
>
> (ii) interfere with or negatively impact customer and other material business relationships of any Company Entity.

(Rogers Agreement ¶ 7(b).) The provisions of the Non-Compete section apply without any geographic limitation.

{17} In the section titled "Return of Property, Non-Solicitation," the Rogers Agreement states that during the Restrictive Period, Rogers would not

> directly or indirectly, individually or through any Person he Controls, (i) solicit for employment any employee of any Company Entity, (ii) interfere with or seek to interfere with the employment relationship between any employee of any Company Entity and a Company Entity (including any such solicitation or interference made on behalf of or as representative of, any other Person) or (iii) except in connection with the provision of the Consulting Services, call on or solicit any customer or client, or prospective customer or client, of any Company Entity, provided however, [Rogers] may hire persons who are not engaged in Restricted Business and who respond to a general advertisement or who directly approach [Rogers] in connection with activities other than Restricted Business.

(Rogers Agreement ¶ 8(b).)

2.     The Taylor Agreement

{18} The agreement Taylor executed with Akzo Nobel ("Taylor Agreement") contains, *inter alia*, a choice-of-law provision, a non-competition provision, and a non-solicitation provision. It states that the "laws of the State of Delaware, excluding the law on conflicts of law of such state, shall govern and be applicable to any dispute under this agreement." (Taylor Agreement ¶ 8.)

{19} In the section titled "Noncompetition," the Taylor Agreement states that three (3) years after termination (the "Restricted Period"), Taylor would not

> directly or indirectly, engage in, participate in, or acquire an equity interest in any person, firm, corporation or other entity, which engages or participates in any business that operates any line of business, business activity or operations that are competitive with any line of business, business activity or operations with wood coatings conducted by Employer or any of its affiliates during the Restricted Period (the "Restricted Business") . . . . For the avoidance of doubt, Chemcraft and its subsidiaries shall be considered affiliates of Employer at and after the Closing Date.
>
> [Taylor] hereby acknowledges and agrees that the Restricted Businesses engaged in by Employer and its affiliates extends throughout North America (the "Restricted Territory") and that Employer and its affiliates may be harmed by competitive conduct anywhere in the Restricted Territory. [Taylor] therefore agrees that the covenants contained in the provisions under [this heading] shall be applicable in and throughout the Restricted Territory, as well as throughout other areas of the world in which Employer and its affiliates may be (or have prepared written plans to be) doing business from time to time . . . .

(Taylor Agreement ¶ 5.)

{20} The section titled "Nonsolicitation" states

> [Taylor] further agrees that while [he] is employed by Employer or any of its affiliates and during the Restricted Period, [he] will not hire or attempt to hire any employee of Employer or any of

its affiliates, assist in hiring such a person, encourage any such employee to terminate or diminish his or her relationship with Employer or any of its affiliates, or solicit or encourage any customer or vender of Employer or any of its affiliates to terminate its relationship with them or, in the case of a customer, to conduct with any person any business or activity which such customer conducts or could conduct with Employer or its affiliates.

(Taylor Agreement ¶ 6.)

3.    The Schoning Agreement

{21} The agreement Schoning executed with Chemcraft ("Schoning Agreement") contains, *inter alia*, a non-competition provision and a non-solicitation provision. The non-competition provision provides that for one year after termination of employment with "any Company Entity," Schoning would not

directly or indirectly, engage in, participate in, or acquire an equity interest in any person, firm, corporation or other entity, which engages or participates in any business that operates any line of business, business activity or operations that are competitive with any line of business, business activity or operations with the wood coatings business conducted by any Company Entity during the Restricted Period.

(Schoning Agreement ¶ 1(a).) The Schoning Agreement further provides that

the Restricted Business engaged in by the Company Entities extends throughout North America (the "Restricted Territory") and that Company Entities may be harmed by competitive conduct anywhere in the Restricted Territory. Employee therefore agrees that the covenants contained in the provisions under the heading "Noncompetition" shall be applicable in and throughout the Restricted Territory, as well as throughout other areas of the world in which the Company Entities may be (or have prepared written plans to be) doing business from time to time.

(Schoning Agreement ¶ 1(b).)

{22} In the section entitled "Nonsolicitation," Schoning agreed that during his employment and the Restricted Period he would

> not hire or attempt to hire any employee of any Company Entity, assist in hiring such a person, encourage any such employee to terminate or diminish his or her relationship with any Company Entity, or solicit or encourage any customer or vendor to any Company Entity to terminate its relationship with them or, in the case of a customer, to conduct with any person any business or activity which such customer conducts or could conduct with any Company Entity.

(Schoning Agreement ¶ 2.)

4.    Parker and Caravello Agreements

{23}  The Parker and Caravello Agreements, executed with Chemcraft,[3] contain, *inter alia*, a non-competition provision and a confidentiality provision.

{24}  In the section entitled "Covenant not to Compete and Non-Inducement Agreement," the agreements provide that for a period of twenty-four (24) months after termination, Parker and Caravello would not

> in any of the territories listed on Exhibit A, as an owner, manager, operator, employee or consultant, directly or indirectly contact any of the Companies' customers with whom the Company did business during the three (3) years preceding Employee's termination for the purpose of selling, purchasing, developing, manufacturing or distributing industrial liquid coatings.

(Parker & Caravello Agreements ¶ 4.1.)  The agreements further provide that during the same twenty-four (24) month period, Parker and Caravello would not

> directly or indirectly, solicit or induce any customer, supplier, vendor or other business relation of the Company to reduce the amount of business it does with Company.  During this time, Employee also agrees not to directly or indirectly solicit or induce any other Employee of the Company to leave employment with the Company.

---

[3] Parker and Chemcraft executed a Confidentiality Agreement and Covenant not to Compete on August 1, 2003.  Caravello and Chemcraft executed a Confidentiality Agreement and Covenant Not to Compete on April 1, 2004.  Although Parker and Caravello executed their respective agreements at different times, the relevant confidentiality and non-compete provisions are nearly identical.

(Parker & Caravello Agreements ¶ 4.2.)

{25} Exhibit A describes the territory to which the Parker and Caravello Agreements relate. The territory includes the "broadest of the following geographic areas:"

1. All portions of the North American continent.

2. All portions of the United States of America.

3. All states in which the employee conducted business or contacted current or potential customers during the year preceding the termination of Employee's Employment with the Company.

4. Within two hundred miles of all home offices to which the Employee was assigned for a period of at least one week during the year preceding the termination of Employee's employment with the Company.

(Parker & Caravello Agreements Ex. A.)

{26} The section titled "Confidential Information," provides that Parker and Caravello shall not, either during their employment, or any time thereafter:

directly or indirectly, use or disclose to any person any Confidential Information obtained by him/her during the course of his/her employment, save as may be required in connection with his/her said employment in accordance with the terms thereof. . . .

without limiting the generality of the foregoing, the Employee shall deliver to the Company on demand, without retaining any copies thereof, all notes, records, plans, extracts, photographs and documents relating, directly or indirectly, to the Confidential Information, which may be in the possession or under the control of the Employee. For greater certainly and without limiting the generality of the foregoing, it is specifically agreed that the Confidential Information referred to in this Agreement includes the Confidential Information and trade secrets of the Company's clients.

(Parker & Caravello Agreements ¶¶ 2.1, 2.2.)

C. Additional Factual Allegations

{27} Plaintiff repeatedly alleges that the Individual Defendants are "overtly trading on the Chemcraft name, [their] association with Chemcraft, and the experience in the wood coatings industry gained through [their] employment with Chemcraft." (Compl. ¶¶ 43, 57, 67, 76.) Plaintiff further asserts that the Individual Defendants

> intentionally violated the promises made in [their] Agreement[s], including, through [themselves] and in concert with the other Defendants, soliciting and attempting to solicit customers away from Akzo Nobel, making improper use of confidential and proprietary information and trade secrets of Akzo Nobel, and, upon information and belief, soliciting and attempting to solicit employees away from Akzo Nobel.

(Compl. ¶¶ 49, 58, 68, 77.)

{28} In support of these sweeping general allegations, Plaintiff offers three specific instances of conduct which it contends violate the Individual Defendants' agreements.

{29} First, with respect to Rogers, Akzo Nobel alleges that in June 2009, Rogers formed an association with a European coatings company called Bergolin and an affiliate company called Bergolin USA, LLC.[4] (Compl. ¶ 25−28.) Upon learning of Rogers' association with Bergolin and Bergolin USA, LLC, Akzo Nobel sent Rogers a letter, dated August 17, 2009, reminding him of his obligations under the Rogers Agreement. (Compl. ¶ 30.) In his response letter dated August 25, 2009, Rogers affirmatively represented that he was "not in violation of [his] agreement[;]" that he was "not an employee or sales representative of . . . Bergolin of Germany[;]" that the only "purpose of Bergolin USA is to sell coatings to windmill blade manufacturers[;]" that "Bergolin USA is not engaged in the industrial wood coatings business in the US[;]" that he "did not retain any confidential

---

[4] Akzo Nobel alleges that Bergolin USA, LLC later became known as ATec Wind (Compl. ¶¶ 28, 37) and that Rogers formed Bergolin North America, LLC in June 2009. (Compl. ¶ 37.)

documents upon [his] resignation from Chemcraft in July 2007[;]" and that he had "no intention of violating the agreement." (Compl. ¶ 31–36.) Also in June 2009, Rogers organized Bergolin North America, LLC without informing Akzo Nobel. (Compl. ¶ 37–38.) Plaintiff alleges these acts and omissions were both breaches of contract and misrepresentations. It believes that as of August 25, 2009, "Rogers was in fact competing or intending to compete with Akzo Nobel, was in fact soliciting or intending to solicit Akzo Nobel employees or customers, and/or was assisting Bergolin in doing so." (Compl. ¶ 39.)

{30} Second, Plaintiff specifically alleges that "Rogers has caused, or conspired with other Defendants, to successfully solicit away customers of Akzo Nobel . . . For example, Rogers, through ATec and in concert with other Individual Defendants, has stolen from Akzo Nobel an Arizona-based metal-buildings coating customer."[5] (Compl. ¶ 50.)

{31} Third, with respect to Parker, Plaintiff alleges that "[s]hortly before leaving his employment with Akzo Nobel, Parker . . . obtained technical materials for Akzo Nobel products wholly unrelated to his work for the company, including his removal from the Akzo Nobel premises formulas and technical information concerning Akzo Nobel's fiberglass door coating products." (Compl. ¶ 111.) While each Individual Defendant is alleged to be jointly responsible for the trade secrets misappropriations by Parker there are no other allegations identifying specific trade secrets, confidential information, or proprietary information misappropriated by the Individual Defendants other than Parker.

---

[5] Akzo Nobel does not identify the "Arizona-based metal-buildings coating customer" by name but alleges that the unidentified "customer has provided it with sales in excess of $11,000,000.00 (as much as $2,800,000.00 annually) over the past seven (7) years." (Compl. ¶ 50.) Akzo Nobel does not identify any other customers allegedly solicited by the Individual Defendants.

## IV.  STANDARD OF REVIEW

{32}  The standard of review for a Rule 12(c) motion is the same as for a motion to dismiss under Rule 12(b)(6).  *A-1 Pavement Marking, LLC v. APMI Corp.*, 2008 NCBC 13 ¶ 35 (N.C. Super. Ct. Aug. 4, 2008), http://www.ncbusinesscourt.net/opinions/2008_NCBC_13.pdf.  "All well-pleaded facts in the complaint must be accepted as true and the plaintiff is entitled to all permissible inferences to be drawn from those facts."  *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC 5 ¶ 5 (N.C. Super. Ct. May 26, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%205.htm.  In deciding the motion, the Court can consider documents referred to in or attached to the pleadings.  *Reese v. Mecklenburg County*, 200 N.C. App. 491, 497, 685 S.E.2d 34, 38 (2009).  "The rule's function is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit."  *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).  The motion should be denied "unless it is clear that plaintiff is not entitled to any relief under any statement of the facts."  *Praxair*, 1999 NCBC 5 ¶ 5.  Where "the Court also can construe the plain and unambiguous language of a contract to determine if it has been breached, judgment on the pleadings may be appropriate."  *Id.*

## V.  ANALYSIS

### A.  Choice of Law Determination

{33}  The Court must first determine whether to give effect to the Delaware choice-of-law provision in the Rogers and Taylor Agreements. Defendants argue that the application of Delaware law is contrary to North Carolina's "blue pencil" rule which restricts the courts' power to alter restrictive covenants because it is based on public policy, and Delaware's allowing courts to rewrite covenants in order to make them reasonable violates that policy.  *See Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C.

App. 307, 317, 450 S.E.2d 912, 920 (1994) (discussing North Carolina's "blue pencil rule" and indicating that "a court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision enforceable"); *See Knowles-Zeswitz Music, Inc. v. Clara*, 260 A.2d 171, 175 (Del. Ch. 1969) (indicating that Delaware law allows courts to modify or re-write a covenant not to compete in order to make it enforceable). Plaintiff argues that no such public policy exception exists in North Carolina and that the choice-of-law provisions should be honored.

{34} As a general rule, "North Carolina will give effect to a contractual provision agreeing to a different jurisdiction's substantive law." *Covenant Equip. Corp. v. Forklift Pro, Inc.*, 2008 NCBC 10 ¶ 39 (N.C. Super. Ct. May 1, 2008), http://www.ncbusinesscourt.net/opinions/2008%20NCBC %2010.pdf (citing *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). The rule has been applied in the context of covenants not to compete. *See Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999). Under certain circumstances, however, "North Carolina courts will not honor a choice of law provision." *Cable Tel. Servs., Inc. v. Overland Contr'g, Inc.*, 154 N.C. App. 639, 642, 574 S.E.2d 31, 33 (2002).

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of a particular issue and which, under the rule of § 188 [of the Restatement (Second) of Conflict of Laws], would be the state of applicable law in the absence of an effective choice of law by the parties.

*Id.* at 643, 574 S.E.2d at 33–34.[6]

---

[6] In *Tanglewood Land Co.*, the North Carolina Supreme Court held that unless the parties to a contract agree to apply another jurisdiction's substantive law, "the interpretation of a contract is governed by the law of the place where the contract is made." 299 N.C. at 262,

{35} There is no question that Delaware has a substantial relationship to the transactions involving Rogers and Taylor. Akzo Nobel is a Delaware corporation, and both the Rogers and Taylor Agreements are made with Akzo Nobel. For the choice-of-law provisions to be unenforceable, their application must violate North Carolina public policy.

{36} The North Carolina Supreme Court recognizes that "at the time of entering . . . contracts containing covenants not to compete both parties apparently regard[] the restrictions as reasonable and desirable. Essentially, by enforcing the restrictions, [a] court is only requiring the defendants to do what they agreed to do." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649, 370 S.E.2d 375, 380 (1988) (internal citations and quotations omitted). Choice-of-law clauses likewise are consensual contractual provisions apparently desired by each party and are not inherently different than other restrictions.

{37} This Court noted in *CNC/Access v. Scruggs* that courts must be cautious when addressing arguments based on "public policy." 2006 NCBC 20 ¶ 52 (N.C. Super. Ct. Nov. 15, 2006), http://www.ncbusinesscourt.net/ opinions/ 2006%20NCBC%2020.htm. Defendants acknowledge that there is no binding authority directly supporting their public policy argument. Nevertheless, they maintain that North Carolina's restrictive blue pencil rule is an entrenched public policy tenet that voids a choice-of-law clause naming a state with a less restrictive remedy.[7] Defendants rely on one North Carolina appellate case and one opinion from a sister state as indirect

---

261 S.E.2d at 656. Here, the parties agree that North Carolina law applies to the agreement if the choice-of-law provision is unenforceable.

[7] In one federal case, the trial court found that because Florida law allows courts to modify non-competes when it finds them unreasonable, the differences between North Carolina and Florida's blue penciling philosophies is great enough to conclude that North Carolina public policy would be violated if Florida law were applied to the agreement. *Broadway & Seymour, Inc. v. Wyatt*, 1991 U.S. App. LEXIS 33801 *13–17 (4th Cir. Sept. 13, 1991) (unpublished). The Fourth Circuit reversed on the basis that the agreement was valid under both North Carolina and Florida law. *Id.*

support of their position, but the Court finds neither of them persuasive. *See Cox v. Dine-A-Mate, Inc.*, 129 N.C. App. 773, 501 S.E.2d 353 (1998); *Stonhard, Inc. v. Carolina Flooring Specialists, Inc.*, 366 S.C. 156, 159, 621 S.E.2d 352, 353 (2005) (on certification from the United States District Court for the District of South Carolina). These cases stand for the proposition that a court can refuse to give effect to a choice-of-law provision under certain circumstances; however, the Court is not persuaded that either compels such a refusal in this case. The decision in *Cox* does not go as far as to disclaim choice-of-law provisions in covenants not to compete where the necessary remedy to assure its reasonable application requires re-writing contractual provisions; it merely allows a public policy exception to preclude using a choice-of-law provision in a non-compete agreement to validate a covenant that fails other essential requirements, such as consideration. In *Stonhard*, the South Carolina Supreme Court did not refuse to apply New Jersey law when the non-compete agreement at issue called for its application, rather, it determined that even under New Jersey law, a court could not add a provision to the non-compete agreement that never previously existed.

{38} The Court also approaches its choice of law recognizing that the Rogers and Taylor restrictions were negotiated in the context of a larger, significant commercial transaction and are then not necessarily representative of more typical restrictive covenants made a part of standard terms in an initial employment agreement.

{39} As an officer and shareholder of Chemcraft, Rogers was in a position to bargain for the terms of his Consulting Agreement. He was paid $9,500,000.00 for the purchase of his Chemcraft stock, and Plaintiff alleges that he was to receive $2000.00 per day for his consulting services. In exchange, he agreed, *inter alia*, that the Agreement "shall be governed by the laws of the State of Delaware . . . ." (Rogers Agreement ¶ 17.)

{40} With respect to Taylor, Plaintiff alleges he was a national marketing manager and a sales director who received $304,000.00 from Akzo

Nobel in exchange for his execution of an employment agreement. His Agreement unambiguously states that the "laws of the State of Delaware, excluding the law on conflicts of law of such state, shall govern and be applicable to any dispute under this agreement." (Taylor Agreement ¶ 8.)

{41} The Court concludes that the choice of law provision in the Rogers and Taylor Agreements were bargained for and should be honored. Doing so does not violate public policy.

{42} The Court is not called upon to decide whether application of Delaware's liberal "blue pencil" might rule violate North Carolina public policy in other cases, and the Court does not decide whether a public policy exception exists when, as in *Stonhard*, an unsophisticated employee signs a non-compete as part of an initial employment agreement.

## B. General Legal Principles

{43} The Individual Defendants' agreements invoke several strands of North Carolina precedent regarding employment agreements. They argue that the Complaint fails to state claims for breach of contract because each of the restrictive covenants is facially overbroad, and, thus unenforceable. They contend that the agreements restrict more conduct than necessary to protect Akzo Nobel's legitimate business interests and that they contain unreasonable time restrictions. Plaintiff counters that the Complaint complies with requisite notice pleading requirements and that Defendants' Motion is premature because the review of the reasonableness of the contracts is inherently factual. Plaintiff urges that it should be allowed to present evidence of "Defendants' job responsibilities and experience, customer contacts, and the locations of same before they resigned from Akzo Nobel, as well as the breadth of the marketplace in which Defendants now operate" before the Court can decide whether the time, scope, and territory restrictions contained in the agreements are overly restraining. (Pl's. Br. in Opp'n to the Individual Defs.' Mot. for J. on the Pleadings ("Pl's. Br. in

Opp'n") 6.) In other words, Plaintiff contends that the Court must apply a balancing test that depends on a developed evidentiary record.

{44} To be enforceable under North Carolina law, restrictive covenants between an employer and employee must be: "(1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *Kuykendall*, 322 N.C. at 649–50, 370 S.E.2d at 380. "When the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based on a new consideration." *James C. Greene Co. v. Kelley*, 261 N.C. 166, 168, 134 S.E.2d 166, 169 (1964). "Covenants not to compete . . . are not viewed favorably in modern law." *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 282, 530 S.E.2d 878, 881 (2000). To be valid, non-competition clauses must "be designed to protect a legitimate business interest of the employer." *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916; *see also Farr Assocs., Inc.*, 138 N.C. App. at 282, 530 S.E.2d at 881. Where a covenant is too broad to constitute a reasonable protection of the employer's business, it will not be enforced. *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989). The reasonableness of a non-compete agreement is a matter of law for the court to decide. *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916.

{45} When analyzing such restrictive covenants, the judiciary balances the employer's interest "in a workable employer-employee relationship" with the public's interest in "individual economic freedom, free dissemination of ideas, and reallocation or [sic] labor to areas of greatest productivity." *Scruggs*, 2006 NCBC 20 ¶ 42 (citing 2 E. ALLAN FARNSWORTH, *FARNSWORTH ON CONTRACTS* § 5.3 (2d ed. 1998)). "While the law frowns upon unreasonable restrictions, it favors the enforcement of contracts intended to protect legitimate interests. It is as much a matter of public concern to see that valid covenants are observed as it is to frustrate oppressive ones." *Kuykendall*, 322

N.C. at 649, 370 S.E.2d at 380 (internal quotations, brackets, and citations omitted). Non-compete covenants which accompany the sale of a business generally are afforded more latitude than covenants ancillary to employment contracts. *See Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663–64, 158 S.E.2d 840, 843–44 (1968).

> Among reasons often given for the greater acceptability of 'sale of business covenants' are that covenants not to compete enable the seller of a business to sell his goodwill and thereby receive a higher price; and they also furnish a material inducement to the purchaser who purchases a business with the hope of retaining its customers.

*Seaboard Indus., Inc. v. Blair*, 10 N.C. App. 323, 333, 178 S.E.2d 781, 787 (1971) (interpreting a non-compete agreement under Georgia law).

{46} The elements are the same for non-competition and non-solicitation clauses, but the latter are more easily enforced, as their restraints on employees are generally more tailored and less onerous on employees' ability to earn a living. *See Aeroflow Inc. v. Arias*, 2011 NCBC 20 n.8 (N.C. Super. Ct. July 5, 2011), http://www.ncbusinesscourt.net/opinions/ 2011_ NCBC_20.pdf.

{47} Under North Carolina law, "protection of customer relationships and goodwill against misappropriation by departing employees is well recognized as a legitimate interest of an employer." *Kuykendall*, 322 N.C. at 651, 370 S.E.2d at 381. "The greater the employee's opportunity to engage in personal contact with the employer's customer, the greater the need for the employer to protect these customer relationships." *Id.* The Court of Appeals noted that in extreme cases when an employee would feel pressure to disclose competitive information to a competitor, the former employer may have a legitimate business interest in prohibiting employment of any kind by defendant. *See Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 639, 568 S.E.2d 267, 273 (2002).

{48}  However, North Carolina courts have refused to enforce non-competition clauses using the terms "directly or indirectly." *See VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (affirming trial court's ruling that plaintiff-employer could not show a likelihood of success on the merits for a preliminary injunction when the non-compete provision stated that the employee could not "own, manage, be employed or otherwise participate in, *directly or indirectly*, any business similar to Employer's") (emphasis added); *see also Schruggs*, 2006 NCBC 20 ¶ 51 (holding that provision restricting employee from competing "directly or indirectly" was greater than necessary to protect a legitimate business interest of the employer).  These same terms may be looked upon more favorably when included in non-solicitation clauses which are by definition narrower in scope than non-compete provisions. *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990) (finding a non-solicitation clause valid when it prohibited the employee from "directly or indirectly solicit[ing] or attempt[ing] to procure the customers, accounts, or business of a Company, or directly or indirectly mak[ing] or attempt[ing] to make car or truck-van rental sales to the customers of Company" in any state or territory in which the company conducts business).

{49}  North Carolina courts have also refused to enforce restrictive covenants that seek to prevent a former employee from competing with employers for whom they have never worked because such covenants would "put the employee in the situation of being under a restrictive covenant he did not agree to, one that may impose restrictions he in fact never would have agreed to in his initial employment agreement.  To impose wider or different restrictions is unfair to the employee." *Better Bus. Forms & Prods., Inc. v. Craver*, 2007 NCBC 34 ¶ 33 (N.C. Super. Ct. Nov. 1, 2007), http://www.ncbusinesscourt.net/opinions/110107%20Order%20Motion%20to%20Dismiss%20webpage.pdf.

{50}  That same logic applies to client-based restrictions.  *Farr Assocs., Inc.*, 138 N.C. App. at 281, 530 S.E.2d at 883.  Generally, covenants which seek to restrict a former employee from competing with future or prospective customers with whom they had no personal contact during employment fail as unnecessary to protect the legitimate business interests of the employer.  *Digital Recorders, Inc. v. McFarland*, 2007 NCBC 23 ¶¶ 25, 60, 71 (N.C. Super. Ct. June 29, 2007), http://www.ncbusinesscourt.net/ opinions/2007%20NCBC%2023.pdf.  The Court of Appeals, however, has upheld a client-based restriction that precluded the defendant from contacting prospective customers who the defendant had contacted during his employment with plaintiff-employer.  *See Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335 (2001).

{51}  Courts generally evaluate time and territory restrictions in tandem under North Carolina law.  *See Farr Assocs., Inc.*, 138 N.C. App. at 280, 530 S.E.2d at 881.  "Although either the time or the territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable.  A longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*."  *Id.*  Additionally, the North Carolina Supreme Court "has recognized the validity of geographic restrictions that are limited not by area, but by a client-based restriction."  *Id.* (citing *Kuykendall*, 322 N.C. 463, 370 S.E.2d 375).

{52}  With respect to time, North Carolina courts have set a five-year time restriction as the "outer boundary" of reasonableness for non-competes that are ancillary to employment, "and even so, five-year restrictions are not favored."  *Id.*  When the restriction on competition results from the sale of a business, courts have upheld restrictive covenants containing limitations of ten, fifteen, and twenty years, as well as limitations for the life of one of the parties.  *Jewel Box Stores Corp.*, 272 N.C. at 663, 158 S.E.2d at 843.  At least for employment agreements not incidental to the sale of a business, "when a non-compete agreement reaches back to include clients of the employer

during some period in the past, that look back period must be added to the restrictive period to determine the real scope of the time limitation," unless the look back provision captures only clients with whom the employee worked during the look-back period. *Farr Assocs., Inc.*, 138 N.C. App. at 280, 530 S.E.2d at 881 (citing *Prof'l Liab. Consultants, Inc. v. Todd*, 345 N.C. 176, 478 S.E.2d 201 (1996)); *see also Wachovia Ins. Servs., Inc. v. McGuirt*, 2006 NCBC 23 ¶¶ 80–82 (N.C. Super. Ct. Dec. 19, 2006), http://www.ncbusiness court.net/opinions/2006%20NCBC%2023.pdf (tacking on look back provision restricting former employee from servicing or soliciting clients to whom he had been assigned during last two (2) years of employment).

{53} The six-part test used to determine whether the geographic scope of a covenant not to compete is reasonable is also applicable to assess a client-based restriction. *Farr Assocs., Inc.*, 138 N.C. App. at 281–82, 530 S.E.2d at 882.

> The six factors are: (1) the area or scope of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Id.* at 281, 530 S.E.2d at 882. Depending on the case, these factors may require factual inquiry based on a developed record.

{54} Under Delaware law, covenants not to compete first must meet general contract law requirements. *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987); *see also Res. & Trading Corp. v. Pfuhl*, 1992 WL 345465 at * 6 (Del. Ch. Nov. 18, 1992) (unpublished). To be enforced, they must be determined as well to be reasonably limited temporally and geographically, and their purpose and operation must "foster a legitimate economic interest of the plaintiff." *McCann Surveyors, Inc.*, 611 A.2d at 3; *see also Res. & Trading Corp.*, 1992 WL 345465 at * 6. The effect of the agreement must be to protect an employer from sustaining damages which an

employee's subsequent competition may cause . . . ." *Faw, Casson & Co. v. Cranson*, 375 A.2d 463, 465 (Del. Ch. 1977).

> Because the specific enforcement of such covenants involve important interests of commercial enterprises and of individuals seeking to support themselves and their families financially, and because, in that setting, the court is asked to exercise its distinctly equitable powers, each such case requires a careful evaluation of the specific facts and circumstances presented. Covenants not to compete when contained in employment agreements are not mechanically enforced.

*McCann Surveyors, Inc.*, 611 A.2d at 3.

{55} As in North Carolina, covenants not to compete in Delaware "are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business." *Id.*; *see also Knowles-Zeswitz Music, Inc.*, 260 A.2d at 175.

{56} The Court has analyzed the agreements in this case according to these general principles.

### C. The Claims Related to the Separate Agreements

1.   The Rogers Agreement

{57} The Motion asserts that the Rogers Agreement is facially overbroad because (1) it seeks to restrict Rogers from competing against his former employer and soliciting its employees and former customers "directly or indirectly;" (2) it seeks to restrict competition with companies for whom Rogers has never worked; (3) the non-solicitation clause seeks to prevent Rogers from contacting prospective customers and Akzo Nobel customers with whom he has no prior relationship; and (4) the four-year restrictive period is greater than necessary to protect Akzo Nobel's legitimate business interests.

{58} The Court has determined that the Delaware choice of law provision should be applied.

{59} The non-compete provision of the Rogers Agreement seeks to prevent him from competing "directly or indirectly" with Akzo Nobel or "any

Company Entity engaged in the business of wood coatings," but contains a carve-out which allows him to hold certain equity ownership interests. (*See* Rogers Agreement ¶ 7(a).)

{60} There is no dispute that the Agreement is based on the sale of a business and subject to less judicial scrutiny. *See Faw, Casson & Co.*, 375 A.2d at 465; *Knowles-Zeswitz Music, Inc.*, 260 A.2d at 175; *see also Jewel Box Stores Corp.*, 272 N.C. at 663–64, 158 S.E.2d at 843–44.

{61} Delaware law requires "careful evaluation of the specific facts and circumstances presented" and allows the Court to alter a restrictive covenant to make it reasonable. The Court cannot rule at this time that the prohibition against "direct or indirect" competition is overbroad under Delaware law. *McCann Surveyors, Inc.*, 611 A.2d at 3. The inquiry may be revisited on a more fully developed record.

{62} Even under North Carolina law, the fact that Rogers is prohibited from "direct or indirect" participation in ownership of a competitor would not necessarily render the provision unenforceable under *VisionAIR* and *Schruggs* because Rogers is allowed to invest in competing firms under terms that are more narrowly drawn to protect Akzo Nobel's interests.

{63} The Rogers Agreement prohibits Rogers' solicitation of "any customer or client, or prospective customer or client, of any Company Entity," except through his provision of Consulting Services. (Rogers Agreement ¶ 8(b)(iii).)

{64} Based on Rogers' position as an officer and equity interest holder in Chemcraft, an initial reasonable inference can be drawn that Rogers had significant opportunity to develop relationships within the overall industry, such that Akzo Nobel's relationships with prospective customers could be significantly affected by Rogers' competitive efforts and that this broad restriction is both necessary and represented in the substantial consideration paid to Rogers. *See Kuykendall*, 322 N.C. at 651, 370 S.E.2d at 381.

{65} Rogers also contends that paragraph 8(b) is overly broad because it seeks to restrict him from soliciting "customers or clients, or prospective customer or client of any Company Entity." Whether the affiliates at issue are part of Akzo Nobel's legitimate business interest is a factual question which should not be decided by this Motion.

{66} The Rogers Agreement contains a four-year Restricted Period. (Rogers Agreement ¶¶ 7(a)(i), 8(b).) This time restriction is coupled with a client-based restriction, which is international in scope. (*See* Compl. ¶¶ 2–3.)

{67} Though the scope of Rogers' client-based restriction is extensive, so are his alleged job responsibilities and alleged knowledge of Akzo Nobel's business practices. (*See* Compl. ¶¶ 12–21.) As noted above, the Court is less discerning of an agreement's scope when the non-compete accompanies the sale of a business. These factors lead the Court to conclude that the four-year time restriction, when coupled with the client-based restriction, does not necessarily fail as a matter of law.

{68} Defendants' Motion with respect to the Rogers Agreement is DENIED.

2.      The Taylor Agreement

{69} In addition to the same grounds asserted to invalidate the Rogers Agreement, the Motion highlights particular language of the Taylor Agreement prohibiting him from "solicit[ing] or encourag[ing] any customer of or vendor to any Company Entity to terminate its relationship with them or, in the case of a customer, to conduct with any person any business or activity which such customer conducts or could conduct with any Employer or any of its affiliates." (Taylor Agreement ¶ 6.)

{70} As the Court reads this language, it does not prohibit the solicitation of <u>future</u> customers; it seeks to prohibit any present or future business activity with <u>current</u> customers. If Plaintiff argues it extends to prospective customers, the covenant is nevertheless better reviewed at summary judgment.

{71} The Motion with respect to the Taylor Agreement is DENIED.

3.   The Schoning Agreement

{72} The Motion asserts that the Schoning Agreement is facially overbroad and unenforceable for the same grounds summarized above and further that it fails for lack of consideration because it was not executed as part of an employment agreement. This agreement is governed by North Carolina law.

{73} Executed with Chemcraft,[8] the non-compete provision in the Schoning Agreement seeks to prevent him from "directly or indirectly" competing with Akzo Nobel and "any Company Entity"[9] in the wood coatings business. (Schoning Agreement ¶ 1.)

{74} The Schoning non-compete provision would prevent Schoning from working for a competitor in the wood coatings industry in a position wholly outside the scope of his employment with Chemcraft and from indirect ownership of a competing firm. Thus, this provision goes farther than is necessary to protect a legitimate business interest. *See Aeroflow Inc.*, 2011 NCBC 20 ¶¶ 35–37. The Motion with respect to the Schoning non-competition provision is GRANTED.

{75} The Schoning Agreement prevents him from soliciting "any customer of or vendor to [Chemcraft and its affiliates] . . . to conduct with any person any business or activity which such customer conducts or could conduct with any Company Entity." (Schoning Agreement ¶ 2.)

{76} Under North Carolina law, whether the affiliates at issue in the Schoning Agreement are part of Akzo Nobel's legitimate business interest is a factual question.

---

[8] Akzo Nobel acquired Chemcraft Holdings Corp. and its subsidiaries through a stock sale rather than in an asset purchase, it can enforce the employment agreements executed by its predecessors. *See Covenant Equipment Corp.*, 2008 NCBC 10 ¶ 40.

[9] The Schoning Agreement defines "Company" as Chemcraft Holdings Corporation. It defines "Company Entities" as the "Company and its affiliates" and "Company Entity" as an individual affiliate of the "Company."

{77} Defendants further argue that the language of the Schoning Agreements prohibits the solicitation of prospective customers and should be dismissed under *McFarland*. Plaintiff contends that the clause specifically targets only current customers and vendors.

{78} As with the Taylor Agreement, the language does not appear to prohibit the solicitation of <u>future</u> customers but seeks to prohibit any present or future business activity with <u>current</u> customers.

{79} Defendants argue that the Schoning Agreement fails for want of consideration because it is a stand-alone document and not part of an employment agreement as required by North Carolina. *See Kuykendall*, 322 N.C. at 649–50, 370 S.E.2d at 380. Plaintiff alleges that Schoning signed his Agreement on October 18, 2007, after the sale of Chemcraft but before the merger with Akzo Nobel. (Compl. ¶ 69.) It is undisputed that Schoning received $50,000.00 in return for his covenants. The Court does not believe the covenant supported by independent consideration fails because it was not integrated into a single employment agreement. It is nevertheless part of this employment agreement as required by *Kuykendall*.

{80} The Motion as to the Schoning Agreement is DENIED except as to the non-competition covenant.

4.     Parker and Caravello Agreements

{81} These agreements are governed by North Carolina law. Executed with Chemcraft International, Inc., the non-competition provision of the Parker and Caravello Agreements seek to restrict them from "directly or indirectly" contacting any customers with whom Chemcraft or Akzo Nobel "did business during the three (3) years preceding" the termination of employment for the purpose of competing in the industrial liquid coatings business. (Parker & Caravello Agreements ¶ 4.1 (emphasis added).) Exhibit A lists four territorial descriptions in order from broadly to narrowly defined geographic areas.

{82} The Parker and Caravello Agreements raise different legal issues than the other agreements because of their time restrictions. Paragraph 4.1, the Agreements restrict Parker and Caravello's conduct "for a period of twenty-four months following termination of employment with the Company for any reason," and prohibits them from contacting "any of the Companies' customers with whom the Company did business during the three (3) years preceding [their] termination for the purpose of selling, purchasing, developing, manufacturing or distributing industrial liquid coatings."

{83} As indicated by *Farr Assocs., Inc.*, the look-back provision must be added to the restrictive period to determine the real scope of the time limitation. 138 N.C. App. at 280, 530 S.E.2d at 881 (citing *Prof'l Liab. Consultants, Inc. v. Todd*, 345 N.C. 176, 478 S.E.2d 201 (1996)).

{84} Plaintiff argues that *Farr Assocs., Inc.* is distinguishable and cites *Wachovia Ins. Servs., Inc. v. McGuirt*, 2006 NCBC 23 ¶¶ 80–82 (N.C. Super. Ct. Dec. 19, 2006), http://www.ncbusinesscourt.net/opinions/2006%20NCBC %2023.pdf. In *McGuirt*, the applicable covenant stated that the defendant would not service or solicit clients that he "has been assigned or has developed . . . or has in any way serviced at any time during the last two years of his employment[,]" but did not prevent solicitation of customers with whom the defendant did not have contact during the course of employment. *Id.* at ¶ 77. At paragraph 4.1, the Parker and Caravello non-competition clauses prevent the salesmen from contacting "any of the Companies' customers with whom the Company did business" within the three (3) years prior to their termination. Though the language limits the proscribed competition to the field of industrial liquid coatings, it fails to explicitly limit the restriction to former customers of Parker and Caravello's. Thus, *McGuirt* does not apply and the Court must apply a five-year restriction.

{85} As noted above, a five-year restriction on competition is disfavored and requires a showing of special circumstances. *Farr Assocs., Inc.*, 138 N.C. App. at 280, 530 S.E.2d at 881. Plaintiff alleges that Parker

and Caravello were sales representatives who attempted to solicit its customers and employees in violation of their restrictive covenants. (Compl. ¶¶ 59–68.) There are no special circumstances pled that would allow the Court to determine that a five-year restriction is reasonable in this case.

{86} Even if the Court could use its limited "blue pencil" authority to curtail the scope of the geographic restriction to one of the narrower choices contained in Exhibit A, which it need not now do, the five-year duration standing alone is incurable and unreasonable as a matter of law.

{87} Defendants' Motion with respect to the Parker and Caravello Agreements is GRANTED.

### D. Tort Claims

{88} The Motion asserts that Plaintiff's tort claims are barred by the economic loss doctrine and are not supported by factual allegations independent from the underlying breach of contract claims. (Defs.' Br. in Supp. 15–17.) Plaintiff counters that the Complaint complies with the requisite notice pleading requirements and that the economic loss doctrine is wholly inapplicable in this case. (Pl's. Br. in Opp'n 19–20.)

1.    The Economic Loss Doctrine

{89} While it may have initially been thought of as a restriction that precludes a claim seeking only recovery for economic loss rather than non-economic loss such as a personal injury, the term "economic loss doctrine" has a broader meaning. It has been used to denote limitations on the recovery in tort when a contract exists between the parties that defines the standard of conduct and which the courts believe should set the measure of recovery. "Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *North Carolina State Ports Auth. v. Lloyd A. Fry Roofing, Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 349 (1978). Generally, then, the North Carolina courts do not recognize a claim for tortious breach of contract. To state a viable claim in tort for conduct that is also alleged to be a breach of contract, "a plaintiff must allege a duty owed to him by the

defendant separate and distinct from any duty owed under a contract." *Kelly v. Georgia Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009) (citations omitted). This so called "independent duty" exception has been "carefully circumscribed by state law." *Strum v. Exxon Co., USA*, 15 F.3d 327, 331 (4th Cir. 1994). The independent tort must be "identifiable" and "the tortious conduct must have an aggravating element" such as fraud, malice, reckless indifference, oppression, insult, or willfulness. *Strum*, 15 F.3d at 331; *see also Taha v. Thompson*, 120 N.C. App. 697, 705, 463 S.E.2d 553, 558 (1995). The policy behind the independent tort exception recognizes that the open-ended nature of tort damages should not distort bargained-for contractual terms. *Broussard v. Mineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998).

{90} Plaintiff contends that "the economic loss rule has no application to employment cases, nor [has] it [been] applied in an action seeking injunctive relief." (Pl's. Br. in Opp'n 19.) Relying on *Ellis-Don Const., Inc. v. HKS, Inc.*, Plaintiff broadly asserts that "North Carolina's economic loss rule bars claims in tort for purely economic loss in the sale of goods covered by contract law, including the UCC. It does not limit tort actions that arise in the absence of a contract, nor is there any indication that the courts of North Carolina have expanded the rule beyond its traditional role in product liability cases." (Pl's. Br. in Opp's 19 (citing *Ellis-Don Const., Inc. v. HKS, Inc.*, 353 F. Supp. 2d 603, 606 (M.D.N.C. 2004).)

{91} While *Ellis* properly states that the economic loss rule, by that name, was initially "conceived of as a means by which to confine products liability in tort to damages for personal injury and injury to property other than the goods sold, and leave to contract law the questions of liability for purely economic losses," *Ellis*, 353 F. Supp. 2d at 606, North Carolina law has not confined its limitation of remedies as Plaintiff suggests. A broader doctrine labeled as the "economic loss rule" routinely operates to bar tort claims that "piggyback" breach of contract claims outside of the products

liability context. *See, e.g., Ford v. All-Dry of the Carolinas, Inc.*, No. COA10-931, 2011 N.C. App. LEXIS 713 (N.C. Ct. App. Apr. 19, 2011) (relying on economic loss rule to dismiss negligent construction claim arising out of breach of underlying construction contract), *aff'd*, 2011 N.C. App. LEXIS 774 (N.C. Ct. of App., Apr. 19, 2011); *Land v. Tall House Bldg. Co.*, 165 N.C. App. 880, 602 S.E.2d 1 (2004) (affirming dismissal of negligent construction claim based on the economic loss rule), *aff'd*, 2004 N.C. App. LEXIS 1541 (N.C. Ct. App., Aug. 17, 2004); *ACS Partners, LLC v. American Group, Inc.*, No. 3:09cv464-RJC-DSC, 2010 U.S. Dist. LEXIS 19906 (W.D.N.C. Mar. 5, 2010) (adopting recommendation of Magistrate Judge Cayer in *ACS Partners, LLC v. American Group, Inc.*, No. 3:09cv464-RJC-DSC, 2010 U.S. Dist. LEXIS 19907 (W.D.N.C. Feb. 12, 2010) and relying on the economic loss rule to dismiss plaintiff's tort claims in action for breach of non-compete and confidential disclosure provisions of employment contract); *Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.*, No. 1:09cv00018, 2010 U.S. Dist. LEXIS 107526 (M.D.N.C. Oct. 7, 2010) (relying on economic loss rule to dismiss plaintiff's negligent misrepresentation claim in common law breach of contract action); *Johnson v. Sprint Solutions, Inc.*, No. 3:08-CV-00054, 2008 U.S. Dist. LEXIS 110205 (W.D.N.C. July 29, 2008) (relying on economic loss rule to dismiss plaintiff's negligent misrepresentation claim in common law breach of contract action).

{92} The holding in *ACS* is particularly instructive in determining whether the economic loss rule precludes Akzo Nobel from pursuing its tort claims against the Individual Defendants. In *ACS*, plaintiff-employer sued its former employee for breach of the parties' non-compete and confidential disclosure agreements after defendant resigned from employment with the plaintiff and began working for Americon, a direct competitor. *ACS*, 2008 U.S. Dist. LEXIS 19906, at *3–4. In its complaint, plaintiff asserted claims, *inter alia*, for breach of contract, tortious interference with a contract and prospective economic advantage, misappropriation of trade secrets, and

unfair and deceptive trade practices alleging that the defendant used confidential and proprietary information in his employment with Americon and confidential information to induce customers to stop doing business with the plaintiff. *Id.* at *5.

{93} Citing *Broussard* and *Strum*, the *ACS* court found that the economic loss rule operated to bar the plaintiff's tort claims because like *Broussard*, the parties' dispute was contractually based and "[p]laintiff fail[ed] to allege an independent reason for a tort-based claim." *Id.* at *21. In holding that "[p]laintiff's tort claims arise out of the performance of the Non-Compete and Confidential Disclosure Agreements and the alleged breach of those agreements" the court explained:

> Plaintiff argues that [defendant] solicited its customers and prospects and made a bid to an ACS prospect on behalf of Americon, while still employed by [plaintiff]. At most, Plaintiff may be able to prove that [defendant] did not carry out his contractual obligations. The mere failure to carry out an obligation in contract, however, does not support an action for tortious interference with contract and prospective advantage.
>
> Plaintiff's claim for tortious interference with contract is neither "identifiable" nor "distinct from" the breach of contract . . . Plaintiff's claim for tortious interference with prospective advantage may be "identifiable," but it is not "distinct from" the primary breach of contract. The purpose of the Non-Compete Agreement was to ensure that [defendant] would not compete with [plaintiff] or solicit its customers. *Broussard* does not allow Plaintiff double recovery from the same conduct alleged in the breach of contract claim.

*Id.* at *19–23.

2.      The Fraud and Negligent Misrepresentation Claims

{94} For a fraud claim to withstand judgment on the pleadings, a plaintiff must allege:

> (1) a material misrepresentation of a past or existing fact; (2) the representation must be definite and specific; (3) made with knowledge of its falsity or in culpable ignorance of the truth; (4) that the misrepresentation was made with intention that it

should be acted upon; (5) that the recipient of the misrepresentation reasonably relied upon it and acted upon it; and (6) that there resulted in damage to the injured party.

*Rosenthal v. Perkins*, 42 N.C. App. 449, 451, 257 S.E.2d 63, 65 (1979). To overcome the economic loss rule, a plaintiff must also "allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract." *Kelly*, 671 F. Supp. 2d at 791 (E.D.N.C. 2009) (citations omitted).

{95} "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988), *appeal after remand*, 101 N.C. App. 1, 398 S.E.2d 889 (1990), *rev'd on other grounds*, 329 N.C. 646, 407 S.E.2d 178 (1991). By definition, the tort of negligent misrepresentation also requires an independent duty of care.

{96} In support of its fraud and alternative negligent misrepresentation claim against Individual Defendant Rogers, Plaintiff alleges "Rogers, in his Response communication to Akzo Nobel in August 2009 and otherwise, as described [in the Complaint], intentionally, or alternatively negligently, misrepresented his intentions as to compliance with his Agreement with Akzo Nobel and his plans and activities in violation of such Agreement" and "Akzo Nobel actually and reasonably relied to its detriment on the aforementioned material misrepresentations of Defendant Rogers." (Compl. ¶ 86–87.)

{97} Specifically, Plaintiff alleges in August 2009, more than two (2) years after its acquisition of Chemcraft, Akzo Nobel sent Rogers a letter reminding him of his obligations under the Rogers Agreement. (Compl. ¶ 29–30.) In response, Rogers affirmatively misrepresented that he was "not an employee or sales representative of the German company [Bergolin][;]" "the only 'purpose of Bergolin USA is to sell coatings to windmill blade manufacturers[;]'" "Bergolin USA is not engaged in the industrial wood

coatings business in the US[;]" he "did not retain any confidential documents upon [his] resignation from Chemcraft in July 2007[;]" and that he had "no intention of violating the agreement." (Compl. ¶ 32–36.) Notably, Akzo Nobel does not contend that Rogers' alleged misrepresentations induced its execution of the Rogers Agreement. Rather, Plaintiff asserts that it relied on the alleged misrepresentations in forbearing an action against Rogers in contract. (Compl. ¶ 40.)

{98} Although the Complaint alleges, with specificity, several material misrepresentations made by Rogers once he was confronted about his relationship with Bergolin, Plaintiff has failed to allege the existence of a duty, owed to it by Rogers, separate and distinct from the duty owed under the Rogers Agreement. Under the Rogers Agreement, Rogers owed a contractual duty to refrain from competing with Akzo Nobel and refrain from soliciting its customers. The breach of that contractual duty cannot provide the basis for an independent claim of fraud or negligent misrepresentation.

{99} Plaintiff has fatally failed to allege the existence of a duty, owed to it by Rogers, that is separate and distinct from the duty imposed by the Rogers Agreement. Absent allegations of a separate and distinct legal duty, Plaintiff has failed to state a claim against Rogers for fraud or negligent misrepresentation upon which relief can be granted.

{100} The Individual Defendants' Motion with respect to Plaintiff's fraud and negligent misrepresentation claims is GRANTED.

3.    The Tortious Interference With Contract and Prospective Advantage
      Claims

{101} To state a claim for tortious interference with a contract, a plaintiff must allege five (5) elements:

> (1) a valid contract between plaintiff and a third person which
> confers upon the plaintiff a contractual right against a third
> person; (2) the defendant knows of the contract; (3) the
> defendant intentionally induces the third party not to perform

the contract; (4) and in doing so acts without lawful justification;
(5) resulting in actual damage to the plaintiff.

*Kuykendall* , 322 N.C. 643, 370 S.E.2d 375 (citing *Childress v. Abeles*, 240
N.C. 667, 84 S.E.2d 176 (1954)).

{102} To state a claim for tortious interference with a prospective
economic advantage, a plaintiff must allege:

> (1) a specific potential contract between the Plaintiff and a third
> party exists; (2) the Defendant intentionally induced the third
> party not to enter into the contract; (3) the Defendant acted
> without justification; (4) but for the Defendant's action the
> Plaintiff and third party would have entered into the contract;
> and (5) the Defendant's action caused actual damage to the
> Plaintiff.

*Dalton v. Camp*, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001).

{103} In order to withstand Individual Defendants' Motion, Plaintiff's
claims must be "identifiable" and "distinct from" the primary breach of
contract claim. *Broussard*, 155 F.3d at 237; *see Taha*, 120 N.C. App. at 705,
463 S.E.2d at 558; *see also PCS Phosphate Co. v. Norfolk S.Corp.*, 559 F.3d
212, 224 (4th Cir. 2009). Plaintiff must also "allege a duty owed to [it] by the
defendant separate and distinct from any duty owed under a contract."
*Kelly*, 671 F. Supp. 2d at 791 (E.D.N.C. 2009) (citations omitted).

{104} Plaintiff relies upon the Individual Defendants' solicitation of its
customers and employees to support its claims for tortious interference with a
contract and prospective economic advantage. (Compl. ¶ 94–107.) The
pleadings specifically allege that "Rogers has caused, or conspired with other
Defendants, to successfully solicit away customers of Akzo Nobel . . . For
example, Rogers, through ATec and in concert with other Individual
Defendants, has stolen from Akzo Nobel an Arizona-based metal-buildings
coating customer." (Compl. ¶ 50.)

{105} When considered in isolation, the allegations in the Complaint
might be sufficient to state a claim for tortious interference, but when viewed

in tandem with the primary breach of contract allegations, the Complaint lacks tort allegations that can be considered "distinct from" the alleged primary breach of the non-compete and non-solicitation agreements. Moreover, the Complaint fails to allege the existence of a duty "separate and distinct" from the Individual Defendants' obligation under their respective agreements.

{106} Plaintiff's claim for tortious interference with a contract and prospective economic advantage may be "identifiable," but the legal duty that precludes the Individual Defendants from soliciting customers and employees of Akzo Nobel is imposed by express contractual agreement between Plaintiff and the Individual Defendants. The purpose of the non-compete and non-solicitation agreements at issue was to ensure that the Individual Defendants would not compete with Akzo Nobel and solicit its customers. Any breach of that contractual duty is properly actionable in contract, without the potential for an open-ended tort damage award.

{107} The Individual Defendants' Motion with respect to Akzo Nobel's claims for tortious interference with a contract and prospective advantage is GRANTED.

4.      The Unfair and Deceptive Trade Practices Claims

{108} To state a claim for unfair and deceptive trade practices under Chapter 75, the plaintiff must allege: (1) an unfair or deceptive act or practice; (2) affecting commerce; and (3) which proximately causes actual injury. *Poor v. Hill*, 138 N.C. App. 19, 27, 530 S.E.2d 838, 844 (2000); *see also Strickland v. Lawrence*, 176 N.C. App. 656, 665, 627 S.E.2d 301, 307 (2006). "[A] practice is unfair when it offends established public policy" and "when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 367, 533 S.E.2d 827, 832 (2000) (quoting *Warfield v. Hicks,* 91 N.C. App. 1, 8, 370 S.E.2d 689, 693, *disc. review denied,* 323 N.C. 629, 374 S.E.2d 602 (1988)) (citations omitted). "The fair or unfair nature of

particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *McDonald v. Scarboro*, 91 N.C. App. 13, 18, 370 S.E.2d 680, 684 (1988). For a practice to be deceptive, it must "possess the tendency or capacity to mislead." *Forsyth Mem'l Hosp. v. Contreras*, 107 N.C. App. 611, 614, 421 S.E.2d 167, 170 (1992). Whether a particular commercial act or practice constitutes an unfair or deceptive trade practice is a question of law. *Norman Owen Trucking, Inc. v. Morkoski,* 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998); *see also First Union Nat'l Bank v. Brown,* 166 N.C. App. 519, 603 S.E.2d 808, 819 (2004).

{109} "It is well recognized . . . that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [N.C. Gen. Stat. § 75-1.1]." *Eastover Ridge, L.L.C.,* 139 N.C. App. at 367, 533 S.E.2d at 832; *Branch Banking and Trust Co. v. Thompson,* 107 N.C. App. 53, 62, 418 S.E.2d 694, 700, *disc. review denied,* 332 N.C. 482, 421 S.E.2d 350 (1992) (citations omitted). To become an unfair trade practice, the breach of contract must be "characterized by some type of egregious or aggravating circumstance." *Norman Owen Trucking, Inc.,* 131 N.C. App. at 177, 506 S.E.2d at 273. It is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." *Broussard*, 155 F.3d at 347 (citing *Strum*, 15 F.3d at 333).

{110} With respect to Taylor, Parker, Caravello, and Schoning, the Complaint contains generic allegations that do little more than recite the *prima facie* elements of an unfair and deceptive trade practices claim. (Compl. ¶ 90–93.) Plaintiff has failed to plead the existence of substantial aggravating circumstances capable of sustaining a claim for unfair and

deceptive trade practices that is "identifiable" and "distinct from" the Individual Defendants' primary breach of contract.

{111} With respect to Rogers, Plaintiff has pled that in August 2009, more than two (2) years after its acquisition of Chemcraft, Rogers affirmatively misrepresented that he was "not an employee or sales representative of the German company [Bergolin][;]" "the only 'purpose of Bergolin USA is to sell coatings to windmill blade manufacturers[;]'" "Bergolin USA is not engaged in the industrial wood coatings business in the US[;]" he "did not retain any confidential documents upon [his] resignation from Chemcraft in July 2007[;]" and that he had "no intention of violating the agreement." (Compl. ¶ 32–36.)

{112} Accepting these allegations as true, and giving effect to all permissible inferences to be drawn from these facts, Plaintiff might be found to have pled an unfair and deceptive trade practice by Rogers, separate and distinct from the underlying breach of contract, in or affecting commerce, but it has not pled the requisite harm resulting from the wrongful act.

{113} It is well settled that "to succeed under G.S. 75-1.1, it is not necessary for the plaintiff to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Christian v. Wall*, 78 N.C. App. 350, 356, 337 S.E.2d 150, 153–54 (1985) (citing *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 453–53, 279 S.E.2d 1, 7 (1981)). Although Plaintiff's allegations fall short of actionable fraud or negligent misrepresentation, the allegations of specific misrepresentations, taken as true, demonstrate a tendency or capacity to mislead and a likelihood of deception.

{114} But, in order to withstand the Motion, and "[a]s an essential element of plaintiff's cause of action, plaintiff must [allege] not only a violation of G.S. 75-1.1 by the defendants, but also that plaintiff has suffered actual injury as a proximate result of defendants' misrepresentations." *Ellis*

*v. Smith-Broadherst, Inc.*, 48 N.C. App. 180, 184, 268 S.E.2d 271, 273–74 (1980) (citing *Mayton v. Haitt's Used Cars*, 45 N.C. App. 206, 262 S.E.2d 680 (1980)); *see Walker v. Branch Banking & Trust Co.*, 133 N.C. App. 580, 585, 515 S.E.2d 727, 730 (1999).

{115} In a cursory attempt to satisfy the injury and proximate cause requirements, Plaintiff avers that "[a]s a result of Defendants' unfair and deceptive acts and practices, Akzo Nobel has been damaged in this State in an amount in excess of $10,000 and is entitled to recover same from each Defendant jointly and severally" and that it "is entitled to have such damages trebled and to an award of costs and reasonable attorney's fees." (Compl. ¶ 92.)

{116} The only specific allegation of damages related to the alleged August 2009 misrepresentations of Rogers provides that Akzo Nobel "reasonably and justifiably relied on the aforementioned representations by Rogers in his Response in not taking legal action against Rogers in August 2009." (Compl. ¶ 40.)

{117} The temporary forbearance of legal action is not, however, sufficient to establish the actual injury requirement of Chapter 75.

{118} Akzo Nobel has failed to present allegations of actual injury suffered as a proximate result of Rogers' and the other Individual Defendants' alleged unfair and deceptive trade practices.

{119} The Motion concedes that the Trade Secrets Protection Act ("TSPA") survives a Rule 12(b)(6) dismissal at least against Parker. Under N.C. Gen. Stat. § 66-146, a violation of the TSPA necessarily constitutes an unfair act or practice under G.S. 75-1.1. *See Ridgway*, 194 N.C. App. at 659, 670 S.E.2d at 329. Accordingly, the Chapter 75 claim against Parker must survive.

{120} But, with the exception of Parker, the Individual Defendants' Motion with respect to Akzo Nobel's claims for unfair and deceptive trade practices is GRANTED.

5.      The Misappropriation of Trade Secrets Claim

{121} The TSPA, N.C. Gen Stat. § 66-152, *et seq.*, provides the owner of a trade secret with a private right of action against a party alleged to have misappropriated trade secrets. N.C. Gen. Stat. § 66-153. To adequately plead a cause of action under the TSPA, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc. v. Michalaski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003); *see also VisionAIR*, 167 N.C. App. at 510–11, 606 S.E.2d at 364 (finding preliminary injunction inappropriate where trade secret is described only in broad product and technology categories).

{122} In support of its TSPA claim, Plaintiff alleges "[s]hortly before leaving his employment with Akzo Nobel, Parker . . . obtained technical materials for Akzo Nobel products wholly unrelated to his work for the company, including his removal from the Akzo Nobel premises formulas and technical information concerning Akzo Nobel's fiberglass door coating products." (Compl. ¶ 111.) The Complaint alleges that the formulas meet the statutory definition of trade secrets under N.C. Gen. Stat. § 66-152(3) in that they "derive independent actual or potential commercial value form not being generally known or readily ascertainable through independent development or lawful reverse engineering" and that Akzo Nobel "made reasonable efforts under the circumstances to maintain the secrecy of its trade secrets." (Compl. ¶ 112-16.)

{123} While the Individual Defendants acknowledge that the Complaint states a TSPA claim against Parker, they challenge the sufficiency of the pleadings as they relate to the other Individual Defendants, specifically contending that the TSPA claim "fails to identify with specificity the trade secrets allegedly misappropriated by Rogers, Schoning, Caravello, or Taylor." (Defs.' Br. in Supp. 17.)

{124} In support of their position, the Individual Defendants cite *Washburn v. Yadkin Valley Bank and Trust Co.* for the proposition that "[a] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is 'insufficient to state a claim for misappropriation of trade secrets.'" 190 N.C. App. 315, 327, 660 S.E.2d 577, 585–86 (2008) (citation omitted).

{125} In *Washburn*, an employer alleged that a former employee "acquired knowledge of [the former] employer's business methods, clients, and other confidential information pertaining to [the] employer's business." *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 586. In affirming the trial court's dismissal of employer's claim under the TSPA, the Court of Appeals found it fatal that the "identification of the trade secrets allegedly misappropriated [was] broad and vague" and "d[id] not identify with sufficient specificity either the trade secrets Plaintiffs allegedly misappropriated or the acts by which the alleged misappropriations were accomplished." *Id.*

{126} Similar to the allegations in *Washburn*, Plaintiff alleges that the Individual Defendants "obtained detailed knowledge of Akzo Nobel's confidential and proprietary information and trade secrets while employed by the company." (Compl. ¶ 109.) It defines its trade secrets broadly as "Akzo Nobel's proprietary formulas, methodologies, customer and pricing data and other confidential information . . . deriv[ing] independent actual or potential commercial value from not being generally known or readily ascertainable." (Compl. ¶ 112.) In further support of its claim, Plaintiff pleads that the Individual Defendants "intentionally . . . through [themselves] and in concert with the other Defendants . . . ma[de] improper use of confidential and proprietary information and trade secrets of Akzo Nobel" and "[u]pon information and belief, by their conduct described above *and as will be proven via discovery in this action*, Defendants have wrongfully misappropriated

Akzo Nobel's trade secrets." (Compl. ¶¶ 49, 58, 68, 77, 114 (emphasis added).)

{127} Even when viewed in concert with Parker's alleged TSPA violation, the sweeping and conclusory allegations in the Complaint fail to identify the trade secrets the Individual Defendants are accused of misappropriating "with sufficient particularity so as to enable [the] defendant[s] to delineate that which [they are] accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc.*, 157 N.C. App. at 468, 579 S.E.2d at 453.

{128} In sum, Plaintiff's "identification of the trade secrets allegedly misappropriated [was] broad and vague" and "d[id] not identify with sufficient specificity either the trade secrets Plaintiffs allegedly misappropriated or the acts by which the alleged misappropriations were accomplished." *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 586. As a result of Plaintiff's failure to identify the trade secrets allegedly misappropriated, the Individual Defendants' Motion is GRANTED with respect Akzo Nobel's claims for violation of the TSPA other than the TPSA claim against Parker.

6.      The Punitive Damages Claim

{129} N.C. Gen. Stat. § 1D-15(a) provides "[p]unitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that an aggravating factor[,]" such as fraud, malice, or willful or wanton conduct, "was present and was related to the injury for which compensatory damages were awarded."

{130} By statute, punitive damages cannot be awarded solely for breach of contract. *See* N.C. Gen. Stat. § 1D-15(d). The North Carolina Supreme Court has consistently given effect to this general rule stating "[t]he appellate courts of this state have long and consistently held that punitive damages should not be awarded in a claim for breach of contract." *Shore v. Farmer*, 351 N.C. 166, 170, 522 S.E.2d 73, 76 (1999). An exception to the

general rule arises when the breach is "accompanied by an identifiable tortious act" and "some element of aggravation." *Id.* (quoting *Stanback v. Stanback*, 297 N.C. 181, 196, 254 S.E.2d 611, 621 (1979) and *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976)).

{131} As detailed above, the Court is not persuaded that Plaintiff can maintain any independent tort claims because the alleged breach of contract was not "accompanied by an identifiable tortious act" and "some element of aggravation." As a result of this deficiency, Plaintiff's punitive damages claims against Rogers, Taylor, Schoning, and Caravello should be dismissed.

{132} The Court cannot dismiss the punitive damages claim against Parker because a claim for punitive damages necessarily follows an allegation of willful and malicious misappropriation of trade secrets. *See* N.C. Gen. Stat. § 66-154(c) ("If willful and malicious misappropriation [of trade secrets] exists, the trier of fact also may award punitive damages in its discretion").

{133} The Individual Defendants' Motion is GRANTED with respect to Plaintiff's punitive damage claims against Rogers, Taylor, Caravello, and Schoning.

## VI. CONCLUSION

{134} Individual Defendants' Motion with respect to the following claims is GRANTED:

1) The Schoning non-competition provision.

2) The Parker and Caravello Agreements.

3) Fraud and negligent misrepresentation.

4) Tortious interference with contract and prospective economic advantage.

5) Unfair and deceptive trade practices claim against Rogers, Taylor, Schoning, and Caravello.

6)    The TSPA claims against Rogers, Taylor, Schoning, and Caravello.

7)    Punitive damages claim against Rogers, Taylor, Schoning, and Caravello.

{135} Individual Defendants' Motion with respect to the following claims is DENIED.

1)    The Rogers Agreement.

2)    The Taylor Agreement.

3)    The Schoning non-solicitation provision.

4)    Unfair and deceptive trade practices claim against Parker.

5)    Punitive damage, to the extent that it depends on the TSPA claim against Parker.


IT IS SO ORDERED, this 3rd day of November, 2011.